**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**VIOLET LYNN MOSELEY,**

      **Plaintiff,**

**vs.**                                **CIVIL ACTION NO. 5:15-13238**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order entered January 5, 2016 (Document No. 10.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 14.)

The Plaintiff, Violet Lynn Moseley (hereinafter referred to as "Claimant"), filed an application for SSI on May 1, 2012 (protective filing date), alleging disability as of April 15, 2010, due to "fibromyalgia, glass in right eye requiring surgery, constant pain, 2 discs in back pressing on nerves, edema, surgery on left knee, eczema, bursitis, arthritis, and high blood pressure.[1] (Tr.

---

[1] On her form Disability Report – Appeal, dated December 20, 2012, Claimant asserted that she experienced "increased pain" and "more difficulty sleeping" since her last disability report. (Tr. at 274.)

at 218, 241.) Claimant's application was denied initially on August 20, 2012 (Tr. at 162-166.) and

upon reconsideration on October 4, 2012. (Tr. at 172-174.) On November 21, 2012, Claimant

requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 175-177.) The hearing was

held on March 4, 2014, before the Honorable William R. Paxton. (Tr. at 103-137.) By decision

dated April 1, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 73-90.)

The ALJ's decision became the final decision of the Commissioner on August 5, 2015 when the

Appeals Council denied Claimant's request for review. (Tr. at 1-6.)[2] On September 17, 2015,

Claimant brought the present action seeking judicial review of the administrative decision pursuant

to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has

the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).

A disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable impairment which can be expected to last for a continuous period of

not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of

disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further

inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant

is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the

second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe

impairment is present, the third inquiry is whether such impairment meets or equals any of the

---

[2] The Appeals Council denied an earlier request for review on June 30, 2015, but set aside the decision "to consider additional information" that Claimant submitted in support of her appeal. (Tr. at 7-12.)

impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §
416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the
fourth inquiry is whether the claimant's impairments prevent the performance of past relevant
work. 20 C.F.R. § 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie
case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the
Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth
and final inquiry: whether the claimant is able to perform other forms of substantial gainful
activity, considering claimant's remaining physical and mental capacities and claimant's age,
education and prior work experience. 20 C.F.R. § 416.920(g). The Commissioner must show two
things: (1) that the claimant, considering claimant's age, education, work experience, skills and
physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job
exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must
follow a special technique at every level in the administrative review process." 20 C.F.R. §
416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory
findings to determine whether the claimant has a medically determinable mental impairment and
documents its findings if the claimant is determined to have such an impairment. Second, the SSA
rates and documents the degree of functional limitation resulting from the impairment according
to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional
> limitations is a complex and highly individualized process that requires us to
> consider multiple issues and all relevant evidence to obtain a longitudinal picture
> of your overall degree of functional limitation. We will consider all relevant and
> available clinical signs and laboratory findings, the effects of your symptoms, and
> how your functioning may be affected by factors including, but not limited to,
> chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the application filing date, May 1, 2012. (Tr. at 78, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: obesity; fibromyalgia; status post left knee surgery; arthritis of the left knee; and arthralgia. (Id., Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 80, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform sedentary work as defined in the Regulations except:

> she can never perform climbing of ladders, ropes, or scaffolds; can never crawl; and can occasionally perform balancing, kneeling, stooping, crouching, and climbing ramps and stairs. In addition, the claimant must avoid concentrated

exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards, such as heights and machinery.

(Tr. at 80-81, Finding No. 4.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 84, Finding No. 5.) At step five of the analysis, the ALJ found Claimant was thirty-nine years old as of the application filing date, which is defined as a younger individual. (Id. at Finding No. 6.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id. at Finding No. 7.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, lack of past relevant work, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 8, 9.) On this basis, benefits were denied. (Tr. at 85, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v.</u>
<u>Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported
by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on July 1, 1972, and was 41 years old at the time of the administrative
hearing, March 4, 2014. (Tr. at 76, 84.) Claimant is able to communicate in English, had completed
the twelfth grade, did not attend special education classes, and completed training as a nursing
assistant. (Tr. at 240, 242.) Her previous work experience was in retail with the most recent being
a teacher's aide in 2010. (Tr. at 242.) Claimant only worked during three years from 2000-2013,
and in her highest earning year, 2008, she earned only $2,664.79, less than substantial gainful
activity level. (Tr. at 230-232.)

<u>The Relevant Evidence of Record</u>[4]

The Court has considered all evidence of record, including the medical evidence, pertaining
to Claimant's arguments and discusses it below.

<u>Medical Evidence:</u>

On November 1, 2011, Claimant underwent arthroscopic surgery of her left knee to repair
a partial anterior cruciate ligament (ACL) tear, patellar malalignment, and lateral meniscal tear.
(Tr. at 451.) On November 22, 2011, she complained of continued swelling and pain in her left
knee, but she denied any numbness or tingling in her legs. (Tr. at 488.) William Nelson, physician's
assistant, reported that examination of Claimant's left knee showed that the wound was healing

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the
parties in their respective pleadings.

without problems, the range of motion was good, and the sensation was intact. (Id.) He encouraged Claimant to remain active and recommended that she undergo physical therapy. (Id.)

On December 16, 2011, Claimant reported that she had still not been to physical therapy because she could not afford to go. (Tr. at 490.) She complained of pain and stiffness in her left knee and she walked with a limp. (Id.) Matthew Nelson, M.D., an orthopedic surgeon, reported that examination of the left knee revealed moderate effusion, range of motion of 0-90 degrees (normal range of motion is to 130 degrees), no erythema or increased warmth, and no abnormal laxity. (Id.) Dr. Nelson diagnosed knee osteoarthritis, and recommended aggressive physical therapy and demonstrated exercises for Claimant. (Id.)

On January 12, 2012, Claimant reported that she had good and bad days, and was having a lot of cramping in her left knee and foot. (Tr. at 492.) She stated that she was doing physical therapy exercises and some walking. (Id.) Dr. Nelson's examination of the left knee revealed no erythema or increased warmth, mild effusion, nearly full range of motion, and a balanced gait. (Id.)

On February 23, 2012, Claimant saw Dr. Nelson after a recent fall; she complained of pain and instability in her left knee. (Tr. at 494.) Dr. Nelson noted mild crepitus (a grating sound produced by friction between bone and cartilage) in Claimant's left knee and pain with passive motion past 90 degrees. (Id.) He injected her left knee with Depo-Medrol. (Id.)

On March 3, 2012, Claimant underwent an MRI of her left knee, which showed an intact ACL, a tear of the lateral patellar retinaculum, and pretibial bursitis. (Tr. at 505-506.)

On March 22, 2012, Dr. Nelson noted that Claimant was still walking with a limp and was using a cane because of instability and weakness in her left knee and ankle. (Tr. at 496.) An

examination of her left knee revealed no erythema, mild effusion, nearly full range of motion, and no abnormal laxity. (Id.) Dr. Nelson administered another injection of Depo- Medrol. (Id.)

On May 24, 2012, Claimant saw Dr. Nelson for a follow up appointment, still complaining of pain and stiffness in her left knee. (Tr. at 498.) An examination of her left knee revealed no erythema or increased warmth, mild effusion, nearly full range of motion, mild crepitus, normal muscle tone, mild fullness of the posterior aspect of the knee, and a well-balanced gait (Id.); Dr. Nelson injected Claimant's left knee with Depo-Medrol and encouraged her to remain active. (Tr. at 499.)

On July 26, 2012, following a fall, Claimant reported that her left kneecap felt out of place at times. (Tr. at 500.) She was able to do most activities, and had minimal pain at rest; Dr. Nelson's examination of her left knee showed crepitus but no erythema or increased warmth, full range of motion, and no apprehension with patellar shift. (Id.) Dr. Nelson injected Claimant's left knee with Depo-Medrol. (Tr. at 501.)

On August 17, 2012, Dominic Gaziano, M.D., State agency physician, reviewed Claimant's medical records and opined that she would be capable of performing a limited range of light work. (Tr. at 145-146.) On September 24, 2012, Uma Reddy, M.D., State agency physician, reviewed Claimant's medical records and opined that she would be capable of performing a limited range of light work. (Tr. at 156-158.)

On October 8, 2012, Claimant saw Amy Dowdy, D.O., her primary care physician, with complaints of dizziness in the morning, left leg swelling, and pain in her left forearm, leg, and low back. (Tr. at 559.) Dr. Dowdy reported that Claimant's gait and station were normal. (Tr. at 560.) Dr. Dowdy prescribed Lyrica, and advised Claimant to eat a healthy diet, decrease her salt intake,

and increase her exercise. (Id.)

On April 24, 2013, Claimant saw Dr. Nelson for a follow up appointment; she stated that her most recent knee injections were extremely painful and did not help. (Tr. at 635.) She complained of bilateral knee pain, intermittent buckling and locking, and was using a cane, which gave her some relief. (Id.) An examination of Claimant's knees revealed crepitus, moderate effusion, and increased laxity to varus valgus stress testing (test for ligament damage), leading to a diagnosis of osteoarthritis. (Id.)

On July 15, 2013, Claimant saw Dr. Dowdy for complaints of chronic left knee pain and worsening joint pain, myalgias, and fibromyalgia, with frequent flares. (Tr. at 579.) Dr. Dowdy observed that Claimant walked with a stiff, antalgic gait; she had normal range of motion and strength with no joint enlargement or tenderness; she had no left knee effusion; and she wore a knee brace. (Tr. at 580.) Dr. Dowdy stressed the need for a healthy diet and exercise, such as swimming or water aerobics. (Tr. at 581.)

On July 31, 2013 Claimant saw Dr. Nelson for a follow up appointment, and she reported that the injections to her knees had helped, but she still had pain in both knees, which got worse with weather changes. (Tr. at 633.) She inquired about a new knee brace, and was walking with a cane. (Id.) An examination of Claimant's knees revealed crepitus, moderate effusion, apprehension to lateral patellar shift, and joint line tenderness. (Id.) There was nearly full range of motion and increased laxity to varus valgus stress testing. (Id.) Claimant's muscle tone was normal, and her gait was balanced. (Id.) Dr. Nelson diagnosed osteoarthritis. (Tr. at 634.) He opined that Claimant would benefit from bilateral knee bracing, and he administered injections of Depo-Medrol and Marcaine to both knees. (Id.)

10

On October 1, 2013, Wassim S. Saikali, M.D., a rheumatologist, examined Claimant on Dr. Dowdy's referral. (Tr. at 619.) An antinuclear antibodies (ANA) test was positive. (Tr. at 621.) Dr. Saikili diagnosed fibromyalgia. (Tr. at 619.) He advised Claimant to increase her activity and perform stretching exercises, and he prescribed an increased dosage of Prozac and Neurontin. (Id.)

On October 30, 2013, Claimant saw Dr. Nelson for a follow up appointment. (Tr. at 631.) She told him that her knee injections helped for about two months (Tr. 631). She was wearing a left knee brace and walking with a cane. (Id.) Claimant complained of pain in both knees, radiating to her mid thighs, examination of both knees revealed crepitus and moderate effusion, abnormal laxity on varus valgus stress testing, and an antalgic gait. (Id.) Dr. Nelson diagnosed osteoarthritis, and administered an injection of Depo-Medrol and Marcaine to Claimant's knees. (Tr. at 632.)

On November 5, 2013, Ruth Rhodes, a physician's assistant associated with Dr. Saikali, saw Claimant for a follow up appointment. (Tr. at 621.) Claimant complained of pain in her arms and legs, which was worse in the evening and sometimes kept her awake at night. (Id.) She also complained of arthralgias in her hands, knees, and ankles, but noted that these were mild in nature and improved with a daily dose of Mobic. (Id.) She also took Zanaflex, as needed, but she did not need to take it every day. (Id.) P.A. Rhodes's examination of Claimant's hands revealed no hot or swollen joints, no evidence of sclerodactyly, and no decreased grip strength; Claimant had full range of motion of her upper extremities bilaterally. (Id.) An examination of Claimant's spine was normal; her hips were normal; she had full range of motion of both knees; and she had no ankle edema, rash, or telangiectasias (spider veins). (Id.) P.A. Rhodes increased Claimant's dosage of Neurontin and encouraged her to do stretching exercises regularly. (Id.)

On January 2, 2014, Claimant saw Dr. Saikali for a follow up appointment. (Tr. at 622.)

Claimant continued to complain of moderate to severe pain and discomfort in multiple joints, including her hands, knees, neck, and back. (Tr. at 623.) On examination, Claimant had decreased range of motion in the second and third DIP joints (distal interphalangeal, the end joints of the fingers). (Id.) Dr. Saikali also perceived tenderness in the trapezia, nuchal area, lateral epicondyle and greater tronchanteric area. (Id.) Dr. Saikali explained to Claimant that she needed to do more exercise and lose weight, and he adjusted her medication regimen. (Id.)

On January 29, 2014, Claimant saw Dr. Nelson for a follow up appointment, complaining of constant pain and buckling in both knees, and she walked with an antalgic gait. (Tr. at 629.) Examination of her knees revealed crepitus, mediolateral joint line tenderness, and abnormal laxity on varus valgus stress testing. (Id.) Dr. Nelson diagnosed osteoarthritis, and noted that Claimant would benefit from continued knee bracing. (Id.)

At a follow up appointment on March 27, 2014, Claimant reported moderate pain and continued knee buckling to Dr. Nelson. (Tr. at 653.) Examination of Claimant's knees revealed crepitus, mild effusion, nearly full range of motion, and an antalgic gait, again Dr. Nelson diagnosed osteoarthritis. (Id.) He injected her knees with Depo-Medrol and Marcaine. (Tr. at 654.)

On April 23, 2014, Claimant saw Barry K. Vaught, M.D., for a neurological consultation on Dr. Nelson's referral. (Tr. at 651.) Claimant complained of bilateral hand tingling, numbness, and wrist pain. (Id.) Dr. Vaught reported that Claimant's motor strength was 5/5 bilaterally in both the upper and lower extremities with normal muscle bulk and tone. (Tr. at 652.) Her sensation was grossly intact to light touch, and her reflexes were normal throughout except for reduced ankle jerks. (Id.) Her coordination was intact, and she had a normal, casual gait. (Id.) Dr. Vaught diagnosed carpal tunnel and lumbosacral radiculopathy. (Id.) He recommended that Claimant

undergo nerve conduction studies. (Id.)

The Administrative Hearing

Claimant Testimony:

Claimant testified that her birth date is July 1, 1972, and that she earned a high school diploma. (Tr. at 107-108.) She testified that she was five feet five inches tall and weighed around two hundred pounds; she stated that some of her medications had caused her to gain weight. (Tr. at 108.) She stated that she was divorced and her two daughters – aged fourteen and eleven – lived with her. (Id.) She stated that she had a driver's license and was able to drive, but she did not drive much. (Tr. at 108-109.) She testified that she drove to the hearing and it took her approximately fifteen minutes to get there. (Tr. at 109.) Claimant testified that she was not working and that she had not worked at any time since filing her application for Supplemental Security Income disability benefits. (Id.)

Claimant testified that the last job she performed was as a teacher's aide, which she quit because she could not tolerate the standing required by that job. (Tr. at 109-110.) She stated that she could not perform a job because of she had "a lot of excess pain with my body" and not just in her legs. (Tr. at 110.) She testified that the majority of the time her pain was related to activity, but she sometimes had pain even when she did not engage in activities. (Id.) She stated that the pain was worse on some days than others. (Id.) She described that walking any distance caused her legs to become numb and throbbing and they felt like "somebody has stuck cinderblocks on them". (Tr. at 111.) She stated that when the pain kicked into her shoulders and her neck it got to the point where she could not work anymore. (Id.)

Claimant testified that she got up in the morning at around 5:30 a.m. and got her daughters

off to school by fixing them a small breakfast, and then she took her medicines and went back to bed at 6:30 a.m. (Id.) She stated that she usually stayed in bed until 1:00 or 1:30 p.m. because of her pain, but her children got home from school at about 2:00 p.m. (Tr. at 112.) She stated that she usually started fixing dinner when she got up in the afternoon because she wanted to make her daughters something healthy; she stated that the family ate around 3:00 or 4:00 p.m. (Id.) She stated that while she was sitting and waiting for food to cook she talked with her two daughters. (Id.) Claimant stated that she might do some housework in the evening, with her daughters' help and said that she had a small lightweight vacuum and used a Swiffer instead of a traditional mop. (Tr. at 113.) She stated that her daughters helped her a lot, including with the laundry. (Tr. at 113-114.) Claimant testified that she did not do yard work. (Tr. at 115.) She stated that she went grocery shopping once or twice a week and her daughters went with her; if she was having a lot of pain she had her daughters go into the store to pick up items while she stayed in the car. (Id.)

Claimant stated that she went to bed at 9:00 or 9:30 p.m., but that she did not sleep well due to her pain. (Tr. at 114.) She testified that she had trouble going to sleep and also had trouble with waking up during the night. (Id.) She stated that she did not know how many hours of sleep she got each night. (Id.)

On the day of the hearing Claimant was using a cane; she stated that she had told her primary physician, her orthopedist, and her rheumatologist that she was using a cane and all of them told her that was okay. (Tr. at 115-116.) She testified that she used her cane while walking outside and especially in bad weather; she stated that she did not use it much in the house. (Tr. at 116.) She stated that she used the cane because she was not stable on her feet. (Id.) Claimant also testified that she had braces on both of her knees that went up over her knees and to her thighs,

14

and that she put these on first thing in the morning and wore them daily (Tr. at 117.); Dr. Nelson, her orthopedist, had prescribed them. (Tr. at 116.) She stated that she had used the braces since 2011 and they were prescribed because her ACL, patella, and kneecaps were not stable. (Tr. at 116-117.)

Claimant testified that she had undergone surgery on her left knee, but that it had not decreased her pain level. (Tr. at 122-123.) She stated that her doctor had recommended that she have surgery on her right knee, but she did not want the surgery since the left knee surgery had not been successful. (Id.) She testified that Dr. Nelson had written a prescription for a handicap sticker for her car. (Tr. at 123.)

Claimant testified that she had been diagnosed with rheumatoid arthritis in her hands, and that Dr. Nelson thought she might also have carpal tunnel syndrome. (Tr. at 117.) She testified that she had an upcoming appointment with a neurologist in April. (Tr. at 117-118.) Claimant stated that her hands had been hurting her for a while, but the problems were "relatively recent". (Tr. at 118.) She stated that she is right handed, the pain was at about the same level in both hands, but the fingers of her right hand were trying to turn up, with her little finger being curved. (Id.) She stated that her fingers swelled every day. (Tr. at 118-119.) Claimant explained that she had changed the way she cooked due to her hand problems. (Tr. at 119.) She noted that she did not cook big meals like she used to and that her oldest daughter helped her out more than she used to, doing such things as opening jars and turning meat in a skillet with a spatula. (Id.) She stated that she still peeled and chopped items, but it was really hard to do so she took breaks in the task, and doing the tasks caused the top of her wrist and hand to get really tired, like someone was pressing on it. (Tr. at 120.) She testified that picking small things up off a table was difficult and she preferred to

slide them to the edge of the table into her hand. (Tr. at 120-121.) She testified that she did not know how to use a computer. (Tr. at 121.)

Claimant testified that she took medication for depression and felt that her depression was better and "not so bad". (Id.) She stated that she did have trouble with her memory and that she forgot small things like the date of doctor's appointments, misplacing items, or forgetting to mail bill payments. (Tr. at 121-122.) She stated that her memory used to be better. (Tr. at 122.)

Claimant testified that she could not walk any distance without her cane. (Tr. at 123.) She stated that she could not walk a block even with her cane because she would be tired and would have to take rest breaks. (Tr. at 124.) She stated that when she grocery shopped she leaned on the buggy and took rest breaks by sitting down if there was a place to sit down. (Id.) She stated that it took her three times as long to grocery shop as it used to take. (Id.) She noted that she had used an electric cart a couple of times but it made her feel foolish. (Id.)

Claimant testified that she could only stand a few minutes at a time, and when fixing meals, she might stand a total of thirty minutes all together. (Tr. at 125.) She stated that the maximum she could lift was a gallon of milk; she explained that she lifted it with one hand, but pulled it in and hugged it with both arms to carry it. (Tr. at 125-126.) She stated that she could lift pans on the stove, but her daughters helped her with that. (Tr. at 126.) She testified that she could sit for as long as she had been sitting at the hearing (about forty minutes), but that she had to move and shift around constantly, which she had been doing. (Id.) She stated that she would need to stand before long and estimated that she could sit for forty-five minutes to an hour before absolutely needing to stand. (Tr. at 126-127.)

Claimant testified that when she was hurting really badly she could not find a comfortable

16

position and she felt better only when she was constantly moving her body. (Tr. at 127.) She stated that she did not do anything socially, although she had gone to a school activity that her daughter begged her to attend and then could stay less than five minutes due to an inability to stand longer than that. (Tr. at 127-128.) She stated that she could not write for long before her hand bothered her and her sister had helped her fill out her Social Security forms. (Id.) She stated that she had no hobbies and although she loved to be outside walking, she could no longer do that. (Tr. at 128.)

Vocational Expert ("VE") Cecelia Thomas Testimony:

The VE testified that sedentary, unskilled jobs would be available for an individual who was a younger person, currently age 41, who had a high school education and no vocationally relevant past work experience, who was limited to sedentary work, but who could never climb ladders, ropes, or scaffolds, or crawling; who could occasionally balance, kneel, stoop, crouch or crawl; and who must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation and hazards such heights and machinery. (Tr. at 132-133.) She stated that examples of jobs available were document preparer, credit clerk, and clerical positions. (Id.)

The VE testified that the last job cited, clerical positions, would be eliminated if the individual described in the first hypothetical question had the same limitations, but was also limited to frequent handling, fingering, and feeling. (Tr. at 133.) She testified that if the individual were limited to only occasional handling, fingering, and feeling then none of the jobs she had cited would be available. (Tr. at 133-134.) She stated, however, that a job that could still be performed would be surveillance system monitor, with 9500 of those jobs available nationally and 900 jobs available regionally (the VE had identified as five states: West Virginia, Virginia, Ohio, Kentucky,

and Pennsylvania). (Tr. at 134, 133.)

The VE testified that if the individual described by the ALJ in the first hypothetical question would be limited to understanding, remembering, and carrying out simple instructions, and could only occasionally interact with the public, the individual would be unable to perform the jobs of credit clerk and document preparation, but might be able to perform a range of the surveillance system monitor positions. (Tr. at 134-135.)

The VE testified that if an individual needed to lie down during a portion of the day outside of normal breaks, for even half an hour a day, the individual would be unable to perform any jobs. (Tr. at 135.) The VE testified that if the individual were off task from completing even routine and repetitive tasks due to a combination of symptoms for at least an hour during an eight-hour work day, then the individual could probably obtain one of the jobs cited, but would be unable to retain it. (Tr. at 136.)

Claimant's Challenges to the Commissioner's Decision

Claimant contends that the ALJ failed to adequately consider her fibromyalgia, an impairment that he found to be severe, either singly or in combination with her other impairments in his step three analysis. (Document No. 13 at 9.) Specifically, Claimant argues that the ALJ did not follow proper legal standards for evaluating Claimant's subjective pain allegations with respect to her credibility, in contravention to SSR 96-7p, 20 C.F.R. § 416.929(c)(4) and pertinent case law.[5] (Id. at 10-11.) Claimant explains that the ALJ did not specify what portions of Claimant's

---

[5] Claimant cites Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985) and Breeden v. Weinberger, 493 F.2d 1002, 1110 (4th Cir. 1974). The undersigned notes that in Hammond, the Fourth Circuit found that it was inappropriate to rely on the information in the Medical-Vocational Guidelines to determine disability without considering the claimant's non-exertional limitations. However, the undersigned further notes that the case at bar is similar to this Court's decision in Addison v. Astrue, 5:10-cv-00228, 2011 WL 1193065 (S.D.W. Va. March 30, 2011), based on the ALJ's specific references to the evidence of record supporting the RFC assessment. This will be examined more in depth, infra. In addition, the undersigned notes that the Breeden Court faced a far more egregious credibility

allegations he found credible or not credible in view of his finding that her statements concerning the intensity, persistence and limiting effects of these symptoms "not entirely credible". (Id. at 13.) In addition, despite his finding Claimant's fibromyalgia a severe impairment, the ALJ did not even mention SSR 12-2p, and further made a determination that Claimant's credibility was deficient based on his improper focus on objective evidence, when the very nature of fibromyalgia does not allow for objective findings supporting allegations of pain or other limitations.[6] (Id. at 14.) Due to the ALJ's reversible errors, Claimant argues that remand is required to make the necessary corrections. (Id. at 15.)

In response, the Commissioner argues that the ALJ adequately evaluated Claimant's allegations of subjective complaints under the Regulations. (Document No. 14 at 11.) The Commissioner adds that subjective complaints of pain are not enough to establish disability, and need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the symptoms the claimant alleges she suffers. Hines v. Barnhart, 453 F.3d 559, 565 n.3 (4th Cir. 2006). (Id.) Further, the Commissioner argues that the ALJ considered Claimant's fibromyalgia and its limitations upon her, but properly found that the objective medical evidence of record did not support her allegations that her limitations from

---

assessment: the ALJ therein simply rejected all testimonies of the claimant's friends and relatives solely based on the source of the testimony, which was and remains contrary to statute, the Regulations and "common sense". Id. at 1010. Moreover, the ALJ therein rejected the testimonial evidence because it failed to 'establish exact dates and precise wages", another "improper or irrational criteria" that would not sustain the ALJ's decision. Id. This did not occur in Claimant's case, however, as discussed infra.

[6] See Stup v. UNUM Life Ins. Co., 390 F.3d 301 (4th Cir. 2004) ("[f]ibromyalgia is a rheumatic disease with . . . symptoms including 'significant pain and fatigue,' tenderness, stiffness of joints, and disturbed sleep." citing Nat'l Institutes of Health, Questions & Answers About Fibromyalgia (Found at: http://www.niams.nih.gov/hi/topics/fibromyalgia/Fibromyalgia.pdf)). See also, Exum v. Astrue, 2012 WL 5363445 (D. Md. Oct. 26, 2012). (Id. at 14-15.)

fibromyalgia were disabling. (Id. at 13.) Moreover, the Commissioner contends that the ALJ took note that Claimant's conservative treatment, her daily activities, and her scant work history indicated that her complaints of disabling symptoms and limitations were not as extensive as she alleged, but still gave her subjective complaints deference by rejecting State agency opinions by limiting her to sedentary work. (Id. at 14-15.) Finally, the Commissioner states that the ALJ's decision is supported by substantial evidence and should be affirmed. (Id. at 15-16.)

In reply, Claimant reiterates that the ALJ's focus on the objective evidence with respect to her fibromyalgia symptoms was legally deficient due to the nature of the disease, and further, reliance on the objective evidence with respect to these symptoms to assess her credibility and RFC was inappropriate; other courts have reversed and remanded similar cases to the one at bar, the same remedy required here. Loving v. Astrue, 3:11-CV-411-HEH, 2012 WL 4329283 (N.D. Va. Sept. 20, 2012)[7]. (Document No. 15.)

Analysis

Social Security Ruling (SSR) 96-7p[8] clarifies when the evaluation of symptoms, including pain, 20 C.F.R. § 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance

---

[7] This case is remarkable insofar as the district court noted was "replete with evidence suggesting [the claimant's] fibromyalgia has rendered her disabled" and the "dearth of evidence to support the ALJ's finding", but other errors in the record below warranted remand: the ALJ completely overlooked the fact that the claimant was being treated by a rheumatologist, a specialist, and did not afford his opinions the heightened weight mandated by the Regulations; the ALJ failed to develop the record due to the lack of substantial evidence supporting his decision; and the ALJ gave greater weight to non-examining State agency consultants who lacked the expertise in rheumatoid disorders and relied solely on objective evidence "despite its limited value in evaluating a fibromyalgia patient's condition." Id., at *8, *9.
[8] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, April 1, 2014.

of explaining the reasons for the finding about the credibility of the individual's statements. 1996 WL 374186, at *1.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. Id. *passim*. In accordance with Section 416.929, the Ruling provides seven factors that an ALJ must consider in addition to the objective medical evidence when assessing a claimant's credibility:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id., at *3.[9]

Social Security Ruling 12-2p states that "before we find that a person with a[] [medically determinable impairment] of [fibromyalgia] is disabled, we must ensure there is sufficient *objective* evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." 2012 WL 3104869, at *2. (emphasis added) In addition, SSR 12-2p provides that "if objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record[.]" Id. at *5. This "evidence in the case record" includes the enumerated Factors listed *supra*, in SSR 96-7p. Id.

In this case, the ALJ noted there was no specific Listing for fibromyalgia, but review of the "objective medical evidence of record" failed to provide any evidence that would have met or equaled any of the Listings. (Tr. at 80.) In addition, the ALJ "considered the additional and cumulative effects" of Claimant's obesity, but found the evidence failed to establish criteria meeting or equaling the Listing for same. (Id.) The ALJ noted Claimant alleged that she was unable to work because of fibromyalgia and knee problems, and that she testified that "she has whole

---

[9] For simplicity's sake, the undersigned will refer to the aforementioned as "Factor #1, Factor #2, etc."

body pain, which is worsened by activity."[10] (Tr. at 81.) Further, it was noted that she had problems with both of her knees, and had surgery on her left knee, but was afraid to have surgery on the other knee.[11] (Id.) Claimant's statements that her symptoms caused her to remain in bed and difficulty sleeping were noted.[12] (Id.) Additionally, the ALJ noted that Claimant reported having carpal tunnel syndrome and rheumatoid arthritis, causing manipulation problems, but there was no evidence of those diagnoses in the record or clinical findings of manipulation problems. (Id.)

The ALJ then performed the two-step process required to assess Claimant's symptoms with the objective medical evidence, and due to Claimant's statements regarding the intensity, persistence and functional limitations of his symptoms, the ALJ found them not entirely credible. (Id.) First, the ALJ noted that because of Claimant's "multiplicity of complaints" for which only "minimal findings" were reported, she was diagnosed with fibromyalgia in 2008. (Tr. at 81-82.) The ALJ then noted Claimant received care from her general practitioner and a rheumatologist; her symptoms of pain and fatigue were "worsened by weather conditions."[13] (Tr. at 82.) She underwent laboratory testing, revealing a positive ANA and scleroderma test, as well as an electromyography that indicated "evidence for left L5-S1 radiculopathy." (Id.) However, the ALJ found that the clinical evidence "demonstrated no hot or swollen joints; no evidence of decreased grip strength; full range of motion in her upper extremities; normal spine; intact hips; and no ankle edema." (Id.)

---

[10] This statement would fall under Factors #2 and #3.

[11] Surgery falls under Factor #5.

[12] Claimant's allegations of remaining in bed and her difficulties sleeping fall under Factors #6 and #7.

[13] Again, the allegation that pain and fatigue are worsened by the weather falls under Factors #2 and #3.

The ALJ further noted that Claimant's pain symptoms were treated "only conservatively."[14] (Id.) Because she had been advised to increase her activity and stretching, and that her medications, "including Zanaflex, Neurontin, and Mobic . . . are effective to improve her condition", such that she does not have to take Zanaflex daily, the ALJ found further restrictions were unwarranted with respect to the established RFC.[15] (Id.) The ALJ also referenced Claimant's Function Report (Tr. at 255-262.) and listed a variety of activities[16] provided therein that he found as evidence that she was not as limited given her complaints of disabling symptoms. (Tr. at 83.) "As of January 15, 2014, the claimant told her physician that she was doing weights and cardiovascular exercise seven times a week"; the ALJ's finding was noted as further evidence of Claimant's physical capabilities.[17] (Id.) Finally, the ALJ noted that Claimant testified that she was

---

[14] Claimant's conservative treatment falls under Factor #5.

[15] Her medications, and the effectiveness thereof, and the advice to exercise fall under Factors #4 and #5.

[16] "Care for her children, do laundry, dust, prepare simple meals, drive, shop in stores for groceries and medication, pay bills, count change, handle a savings account, use a checkbook/money order, watch television, and read" fall under Factor #1, as well as Factor #7.

[17] The undersigned finds that the Exhibit cited in support of this finding, Exhibit 18F, which contained treatment records from Access Health Rural Acres in Beckley, West Virginia, was misinterpreted by the ALJ: under the heading "Previous Health Factor Information", the entry states "Exercise: 7 times/week (data entered on: 09/06/2007" and "Type of exercise: wts and cardio". (Tr. at 606.) From that same Exhibit, this entry is repeated for office visits on October 9, 2013 (Tr. at 611.) and on August 15, 2013. (Tr. at 615.) The undersigned further notes that from other Exhibits in the record containing numerous medical records from Access Health Rural Acres, this entry was repeated for each of Claimant's office visits from June 10, 2011 (Tr. at 545.) through March 7, 2014. (Tr. at 646.) From the records submitted to the Appeals Council after the administrative hearing, the undersigned notes that this entry was updated in the Access Health Rural Acres treatment records: on June 3, 2014 under the heading "Health Factor Information", the entry states "Exercise (times/week). 1" and "Type of exercise. walking" (Tr. at 67.); an office visit on September 2, 2014, under the heading "Previous Health Factor Information", the entry states "Exercise: 1 times/week (data entered on: 06/03/2014)" and "Type of exercise, walking" (Tr. at 63.); this entry was repeated on November 19, 2014 (Tr. at 49.), on December 1, 2014 (Tr. at 45.), and again on January 29, 2015. (Tr. at 41.) The undersigned further notes that Claimant was advised by her primary care physician, Amy Dowdy, D.O., as well as her rheumatologist, Wassim S. Saikali, M.D., to "stay active" and that "she needs to do exercise", on March 3, 2015 and February 10, 2015, respectively. (Tr. at 19, 23.) However, Dr. Dowdy noted that Claimant was not exercising as of March 3, 2015 (Tr. at 18, 19.); as of February 10, 2015, Dr. Saikali noted Claimant reported more pain and fatigue and that medications were not helping, he further noted she had decreased range of motion in the second and third DIP. (Tr. at 23.) **In other words, the ALJ used information entered on 09/06/2007, i.e. "Exercise: 7 times/week", and erroneously made a finding that "[a]s of January 15, 2014, the claimant told her physician that she was doing weights and cardiovascular exercise seven times a week". Claimant's medical records, as outlined herein, clearly show that the ALJ was clearly wrong to conclude that the Claimant was exercising seven times a week.**

able to drive, put her children on the school bus, prepare dinner, sweep, and grocery shop with her children once or twice a week, suggesting that her activities "reveal a significantly greater physical and mental functional capacity than alleged."[18] (Id.)

Next, the ALJ considered Claimant's scant work history, "between 2000 and 2012, the claimant had earnings only three years, and it was all below substantial gainful activity levels." (Id.) This, the ALJ found, "raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." (Id.) Continuing with her work history, the ALJ noted that Claimant admitted in certain medical records (dated May 9, 2012) that she tried to look for work since her alleged onset date, further indicating that her unemployment was due to inability to obtain work, and not a result of functional inability.[19] (Id.)

The ALJ gave opinion of State agency consultant, Dominic Graziano, M.D., "little weight", which assessed Claimant's RFC at the light level of exertion, because the ALJ found that Claimant's history of knee surgery as well as her subjective reports of pain necessitated function restrictions to sedentary work level, and the ALJ included limitations for postural maneuvers and environmental exposures.[20] (Id.) For the same reasons articulated for providing greater restrictions and limitations with respect to Dr. Graziano's opinion, the ALJ assigned "only some weight" to the opinion of State agency consultant, Uma Reddy, M.D., who also assessed Claimant's RFC at light work, with some postural limitations. (Tr. at 83-84.) "[O]nly partial weight" was given to Dr.

---

[18] These activities fall under Factors #1 and #7.

[19] These employment-related findings fall under Factor #7.

[20] In each of his reviews of the State agency consultants' opinions, the ALJ further restricted Claimant's exertional capabilities as well postural maneuvers and environmental exposures due to her prior knee surgery and her subjective complaints of pain, which come under Factor #7, but ostensibly, the RFC assessment appreciates the evidence supporting the remaining Factors as provided under the Ruling.

Subhash Gajendragadkar's opinion, who found Claimant was capable of medium[21] level work, based on the ALJ's review of the objective medical evidence, including her subjective complaints of pain, causing the ALJ to restrict her further to a sedentary RFC. (Tr. at 84.)

After a thorough review of the ALJ's findings and citations to the evidence of record, the undersigned does not agree with Claimant's argument that he neglected to follow the enumerated Factors promulgated by the pertinent Social Security Rulings in evaluating Claimant's credibility, or that he gave inordinate consideration of the objective evidence with respect to fibromyalgia, however, the undersigned is of the opinion that the ALJ's finding that Claimant's "activities reveal a significantly greater physical . . . functional capacity than alleged" when one of his findings supporting this conclusion was based upon a clearly erroneous interpretation of the medical record, specifically, Exhibit 18F. (Tr. at 83.) There is no evidence that Claimant was exercising seven days a week, either cardiovascular or weights on or about January 15, 2014: that same record also indicated that Claimant complained of "numbness in left leg, increase in muscle spasms, swelling in both legs . . . fibromyalgia worse[,] no relief so far with new meds (Tr. at 606.); and, especially notable, "encouraged diet and exercise, maybe join the gym if can afford, must lose weight. [T]opomax may help with that." (Tr. at 608.) In short, Claimant was not exercising all week if her primary care physician recommended she "maybe join the gym". Furthermore, as noted in footnote 17, *supra*, when the ALJ found "[a]s of January 15, 2014, the claimant told her physician that she was doing weights and cardiovascular exercise seven times a week", the ALJ was clearly wrong. The medical record relied upon by the ALJ in reaching that conclusion, Exhibit 18F, was dated January 15, 2014.  However, the reference to exercising 7 days a week clearly states that it was

---

[21] In his RFC assessment dated December 11, 2010, State agency consultant Dr. Gajendragadkar found Claimant capable of lifting/carrying 50 pounds occasionally and 25 pounds frequently (See 20 C.F.R. § 416.967(c)), with hardly any postural restrictions.

based upon data entered on "09/06/2007". There are no records that establish a scintilla of evidence that as of "[a]s of January 15, 2014" the Claimant was exercising 7 days a week. In fact, the records clearly suggest the Claimant was not exercising much, if any.

Although an ALJ must consider the objective evidence of record, even when a claimant has a medically determinable impairment of fibromyalgia pursuant to SSR 12-2p, the factual oversight, *supra*, and explicitly cited by the ALJ in support of his findings, does not provide the substantial evidence required to affirm the decision below. See, generally, Richardson v. Perales, 402 U.S. 389, 390 (1971) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Moreover, it is clear that this mistake of fact was relied upon in the ALJ's assessment of Claimant's credibility, ultimately finding her statements "not entirely credible." (Tr. at 81.) It is for these reasons, remand is in order, to allow the ALJ to either further develop the record with regard to this mistake of fact, or re-examine the evidence mistakenly cited in support of the decision.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 12.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C § 405(g) for further proceedings in order to correct the reliance on the mistaken interpretation of the medical record of evidence described *supra*.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules

6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 21, 2016.

Omar J. Aboulhosn
United States Magistrate Judge